STATE OF NORTH CAROLINA v. JUSTIN EVERETT ROSE, Defendant

No. COA04-353

(Filed 17 May 2005)

**1. Appeal and Error— preservation of issues—failure to renew objection—amendment to Rule 103**

Although the State contends defendant waived his right to argue on appeal the denial of his motion to suppress evidence based on his failure to renew his objection when the evidence was actually offered at trial in a drug case, our legislature recently amended N.C.G.S. § 8C-1, Rule 103 to provide that once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.

**2. Search and Seizure— checkpoint stop—motion to suppress evidence—sufficiency of findings of fact—primary programmatic purpose—reasonableness of checkpoint**

The trial court erred in a possession with intent to manufacture, sell, and deliver marijuana, felony manufacturing marijuana, possession of drug paraphernalia, and possession of a firearm by a convicted felon case by denying defendant's motion to suppress

STATE v. ROSE

[170 N.C. App. 284 (2005)]

evidence uncovered during a checkpoint stop based on the trial court's erroneous consideration of the constitutionality of the checkpoint, and the case is remanded for further findings of fact because: (1) the trial court failed to make findings of fact regarding the primary programmatic purpose of the checkpoint as required by *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000); (2) even if the checkpoint was for a permissible programmatic purpose such as checking licenses and registrations, the trial court failed to conduct the separate analysis of the reasonableness of the checkpoint as mandated by *Illinois v. Lidster*, 540 U.S. 419 (2004), including the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty; and (3) the evidence would permit the trial court to find that there was no plan, no time frame, no supervision, and no direction from anyone (oral or written) about how to conduct these wholly spontaneous checkpoints.

Judge TIMMONS-GOODSON concurring in result only in a separate opinion.

Appeal by defendant from judgments entered 12 December 2003 by Judge Charles H. Henry in Onslow County Superior Court. Heard in the Court of Appeals 18 November 2004.

*Attorney General Roy Cooper, by Special Deputy Attorney General William P. Hart, for the State.*

*Samuel L. Bridges for defendant-appellant.*

GEER, Judge.

Defendant Justin Everett Rose appeals his convictions for (1) possession with intent to manufacture, sell, and deliver marijuana, (2) felony manufacturing of marijuana, (3) possession of drug paraphernalia, and (4) possession of a firearm by a convicted felon. On appeal, defendant contends that the trial court should have granted his motion to suppress evidence uncovered during a checkpoint stop on the grounds that the stop violated his Fourth Amendment rights. We hold that the trial court, in considering the constitutionality of the checkpoint, failed to make findings of fact regarding the "primary programmatic purpose" of the checkpoint required by *City of Indianapolis v. Edmond*, 531 U.S. 32, 148 L. Ed. 2d 333, 121 S. Ct. 447 (2000) and failed to conduct the separate analysis of the reasonable-

ness of the checkpoint mandated by *Illinois v. Lidster*, 540 U.S. 419, 157 L. Ed. 2d 843, 124 S. Ct. 885 (2004). Accordingly, we reverse the order of the trial court and remand for further findings of fact in accordance with *Edmond* and *Lidster*.

Facts

On the evening of 24 April 2003, several members of the Onslow County Sheriff's Department conducted a checkpoint on Queens Haven Road in Hubert, North Carolina. Four of the five officers participating in the checkpoint were members of the Sheriff's Department's Narcotics Division. The checkpoint commenced at approximately 9:15 p.m.

A half-hour later, defendant arrived at the checkpoint, driving a car also occupied by Kevin Davis and Richard Wilson, who is a paraplegic. Deputy Anthony Horne approached defendant's vehicle and asked for his driver's license and registration. From the driver's side of defendant's car, Sgt. Richard Baumgarner scanned the interior of the car. Sgt. Baumgarner noticed that Davis, who was sitting on the rear seat along with a two- to three-foot mounted marlin and a small cooler, had his feet on top of a green backpack and "seemed nervous." Sgt. Baumgarner testified that he believed Davis "was trying to hide the bag with his feet."

Sgt. Baumgarner asked Davis, through the driver's window, what was in the backpack, but Davis simply "looked away." Sgt. Baumgarner then walked around the car to the rear passenger side window where Davis was sitting. Sgt. Baumgarner asked Davis to roll down the window and again asked what was inside the backpack. Defendant, sitting in the front driver's seat, said that the backpack contained "dirty clothes." Davis agreed that the bag contained dirty clothes. Sgt. Baumgarner then again asked, "[W]hat do you have in the backpack, can I check it?" Defendant replied that they needed "to get going" because Wilson, the front-seat passenger, needed to use the bathroom. Sgt. Baumgarner responded, "this will only take a second" and again asked, "Can I see what's in the bag?" According to Sgt. Baumgarner, Davis reluctantly "opened the bag slowly" and let Sgt. Baumgarner see inside.

Inside the backpack were various articles of clothing and a black garbage bag. Sgt. Baumgarner was able to observe a clear plastic bag inside the black garbage bag that contained two bags of what Sgt. Baumgarner believed to be marijuana. At that point, Sgt. Baumgarner

**STATE v. ROSE**

[170 N.C. App. 284 (2005)]

reached inside defendant's vehicle and retrieved the green backpack from Davis. Sgt. Baumgarner asked Davis to step out and walk to the rear of the car. While holding the backpack, Sgt. Baumgarner felt what he believed to be a gun. After he notified the other officers at the checkpoint of that fact, they approached defendant's car and took defendant, Davis, and Wilson into custody. Upon searching the backpack, Sgt. Baumgarner found a loaded .38 caliber revolver and approximately 1 1/2 pounds of marijuana. Defendant stated that the gun and the marijuana was his.

Following the discovery of the weapon and the marijuana, the officers searched defendant's car. Inside the vehicle, the officers found a black backpack containing defendant's passport, defendant's North Carolina driver's license, and several bags of marijuana seeds. The officers arrested defendant, Davis, and Wilson. A search of defendant's pants pockets incident to his arrest yielded 4.8 grams of marijuana, a package of rolling papers, and $883.00 in cash.

On 8 July 2003, defendant was indicted for possession with intent to manufacture, sell, and deliver marijuana; possession of a firearm by a felon; manufacturing marijuana; possession of drug paraphernalia; maintaining a vehicle for the keeping and selling of controlled substances; and carrying a concealed weapon. Prior to trial, defendant filed a motion to suppress the evidence seized in connection with the stop of his vehicle. In an order entered 3 December 2003, the trial court denied defendant's motion, and defendant was tried the week of 8 December 2003. On 12 December 2003, the jury found defendant guilty of possession with intent to manufacture, sell, and deliver marijuana; manufacturing marijuana; possession of drug paraphernalia; and possession of a firearm by a felon. The trial court sentenced defendant to 16 to 20 months imprisonment and six to eight months supervised probation. Defendant timely appealed to this Court.

## Discussion

Defendant's sole argument on appeal is that the trial court erred in denying his motion to suppress.[1] "Our review of a denial of a motion to suppress by the trial court is 'limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's

---

1. Defendant included another assignment of error regarding the sufficiency of the evidence, but he failed to bring forth that argument in his brief. Pursuant to N.C.R. App. P. 28(b)(6), the omitted assignment of error is deemed abandoned.

ultimate conclusions of law.' " *State v. Barden*, 356 N.C. 316, 340, 572 S.E.2d 108, 125 (2002) (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074, 123 S. Ct. 2087 (2003).

I

**[1]** As an initial matter, the State argues that defendant waived his right to argue this issue on appeal because following the trial court's denial of the motion to suppress, defendant did not renew his objection when the evidence was actually offered at trial. While this contention would have once been valid, *State v. Hayes*, 350 N.C. 79, 80, 511 S.E.2d 302, 303 (1999), our legislature has recently amended Rule 103 of the Rules of Evidence to provide: "Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." N.C.R. Evid. 103(a)(2).

This amendment was effective 1 October 2003 and is applicable to rulings on evidence made on or after that date. Since the trial in this case occurred two months following the effective date of the amendment, once the trial court denied defendant's motion to suppress, he was not required to object again at trial in order to preserve his argument for appeal.

II

**[2]** As our Supreme Court acknowledged in *State v. Mitchell*, 358 N.C. 63, 66, 592 S.E.2d 543, 545 (2004), "[p]olice officers effectuate a seizure when they stop a vehicle at a checkpoint." As with all seizures, checkpoints conform with the Fourth Amendment only "if they are reasonable." *Id.* It is well-established that "[a] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 148 L. Ed. 2d 333, 340, 121 S. Ct. 447, 451 (2000).

The Supreme Court has, however, allowed brief, suspicionless seizures at fixed checkpoints designed to intercept illegal aliens, *United States v. Martinez-Fuerte*, 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976); sobriety checkpoints, *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 L. Ed. 2d 412, 110 S. Ct. 2481 (1990); and checkpoints to verify drivers' licenses and vehicle registrations, *Delaware v. Prouse*, 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979). The Supreme Court has also recently upheld a checkpoint "where police stopped motorists to ask them for information about a

recent hit-and-run accident." *Illinois v. Lidster*, 540 U.S. 419, 421, 157 L. Ed. 2d 843, 849, 124 S. Ct. 885, 888 (2004).

On the other hand, the Supreme Court has held: "We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." *Edmond*, 531 U.S. at 44, 148 L. Ed. 2d at 345, 121 S. Ct. at 455. The Court further ruled that "[b]ecause the *primary purpose* of the Indianapolis checkpoint program is ultimately indistinguishable from the general interest in crime control, the checkpoints violate the Fourth Amendment." *Id.* at 48, 148 L. Ed. 2d at 347-48, 121 S. Ct. at 458 (emphasis added).

A. Determination of the Programmatic Purpose

As the State acknowledges, in considering the constitutionality of a checkpoint, a trial court must first "examine the available evidence to determine the primary purpose of the checkpoint program." *Id.* at 46, 148 L. Ed. 2d at 347, 121 S. Ct. at 457. The Supreme Court has stressed, however, that a trial court may not "simply accept the State's invocation" of a proper purpose, but instead must "carr[y] out a close review of the scheme at issue." *Ferguson v. City of Charleston*, 532 U.S. 67, 81, 149 L. Ed. 2d 205, 218, 121 S. Ct. 1281, 1290 (2001) (internal quotation marks omitted). The Court must "consider all the available evidence in order to determine the relevant primary purpose." *Id.*, 149 L. Ed. 2d at 219, 121 S. Ct. at 1290. The trial court's order in this case does not reflect that the court conducted this review in reaching its decision.

In *Edmond*, the Supreme Court emphasized "that the purpose inquiry in this context is to be conducted only at the *programmatic level and is not an invitation to probe the minds of individual officers acting at the scene.*" *Edmond*, 531 U.S. at 48, 148 L. Ed. 2d at 347, 121 S. Ct. at 457 (emphasis added). In this case, however, the trial court simply accepted, without comment, the field officers' label of the checkpoint as a license and registration checkpoint. There is no finding as to the programmatic purpose—as opposed to the field officers' purpose—for the checkpoint at issue. *See People v. Jackson*, 99 N.Y.2d 125, 131-32, 782 N.E.2d 67, 71, 752 N.Y.S.2d 271, 275 (2002) ("Under the holding in *City of Indianapolis*, the People have the burden of establishing that the primary *programmatic* objec-

tive (not the subjective intent of the participating officers) for initiating a suspicionless vehicle stop procedure was not merely to further general crime control . . . ."). Nor does the record or the transcript indicate that the trial court conducted "a close review" of "all the available evidence" prior to accepting the officers' labeling of this checkpoint as a license and registration checkpoint. *Ferguson*, 532 U.S. at 81, 149 L. Ed. 2d at 218-19, 121 S. Ct. at 1290 (internal quotation marks omitted).

Further, the Supreme Court has held that a trial court cannot avoid making a determination of the primary programmatic purpose simply by finding that a checkpoint had at least one lawful purpose, such as "keeping impaired motorists off the road and verifying licenses and registrations." *Edmond*, 531 U.S. at 46, 148 L. Ed. 2d at 346-47, 121 S. Ct. at 457. As the Court explained, "[i]f this were the case . . ., law enforcement authorities would be able to establish checkpoints for virtually any purpose so long as they also included a license or sobriety check." *Id.*, 148 L. Ed. 2d at 347, 121 S. Ct. at 457. As a leading commentator has written: "Surely an illegal multi-purpose checkpoint cannot be made legal by the simple device of assigning 'the primary purpose' to one objective instead of the other, especially since that change is unlikely to be reflected in any significant change in the magnitude of the intrusion suffered by the checkpoint detainee." 4 Wayne R. LaFave, *Search and Seizure* § 9.7(b), at 709 (4th ed. 2004).

This is not a case in which all of the evidence suggests that the checkpoint was for the constitutional purpose of examining licenses and registrations. The State offered the testimony of three of the five field officers conducting the checkpoint. There was no evidence of purpose offered other than that of the "individual officers acting at the scene." *Edmond*, 531 U.S. at 48, 148 L. Ed. 2d at 347, 121 S. Ct. at 457. One of those officers confirmed that the checkpoint was requested by Deputy Ides, a uniformed patrol officer assigned to the area who also participated in conducting the checkpoint. Deputy Ides did not testify and, therefore, the State did not even offer evidence of his purpose in requesting the checkpoint. The evidence that was presented would support a finding that the programmatic purpose— to the extent one existed at all—may well have been general crime detection with an emphasis on narcotics interdiction.

Four of the five officers conducting the checkpoint were detectives with the Narcotics Division. The fifth officer was Deputy Ides, who requested this checkpoint. The testimony of the Narcotics

Division detectives reveals that the Narcotics Division is responsible for these checkpoints on their own:

> Q. Officer Baumgarner, on this date do you remember when the request was made for a driver's license check point set up on Queen's Haven Road?
>
> A. No, I don't remember the exact date. He asked us numerous times.
>
> Q. Do you know when that was approved and set up and planned?
>
> A. We don't do it that way. We get a request from one of the officers in a township, and we just go out there whenever we're available.
>
> . . . .
>
> Q. What time was your—and I guess when y'all made the plan to go out and do a driver's license check point, what time were y'all suppose [sic] to arrive that night?
>
> A. Actually, we were all together at the time when we decided to go out there.
>
> Q. What time were y'all planning to go out there?
>
> A. *There was no plan prior to that. We just decided to throw one up while we were out that way.*
>
> Q. What do you mean "just decided to throw one up"?
>
> A. *These check points are spontaneous.* They are not planned, they are not put in the newspaper or anything like that. We just spontaneously throw them up.
>
> . . . .
>
> Q. How often do y'all set up check points like this at different spots?
>
> A. On a regular basis. *Whenever we're inbetween* [sic] *cases or whatever, when we're out patrolling certain areas. We do them all over the county, and like I said, there's no plan to it. They're just spontaneous.*

(Emphasis added.) No one explained why there was a particular need for a checkpoint in this particular area of the county. It seems unlikely that one part of Onslow County was having a larger problem

with unlicensed or unregistered drivers than another part, although on remand the trial court should inquire into the particular need for a checkpoint in this area. On the other hand, different neighborhoods might well have different difficulties with drug trafficking.

We also know that at this particular checkpoint one officer would approach the driver to ask for the license and registration, while a second officer would scan the inside of the vehicle and walk around it. The testimony does not explain why a second officer was necessary to check licenses and registrations. In this case, it appears that the function of the second officer may have been to scan for possible criminal activity.

Other courts have concluded that such evidence supported a finding that the checkpoint had an impermissible purpose of general law enforcement. In *Baker v. State*, 252 Ga. App. 695, 698-99, 556 S.E.2d 892, 897 (2001), *cert. denied*, 2002 Ga. LEXIS 423 (Ga. May 13, 2002), the State relied only on the testimony of one of the officers conducting the roadblock, who asserted that his purpose was to perform DUI checks. In holding that the State had failed to meet its burden of proving the constitutionality of the roadblock, the Georgia Court of Appeals reasoned:

> [T]he decision of the United States Supreme Court in *Edmond* has elevated proof of the supervisor's "primary purpose" to a constitutional prerequisite of a lawful checkpoint. We do not know from the transcript whether "DUI checks" were the purpose of the supervisor who decided to implement the roadblock or were the purpose of the officers in the field. The burden was on the state to prove that the seizure, i.e., the stopping of [defendant's] vehicle, was constitutionally valid. Under the guidance of *Edmond*, the required proof included evidence of the supervisor's primary purpose in implementing the roadblock. We will not presume from a silent record that constitutional requirements have been satisfied.
>
> . . . .
>
> [W]hat we hold is that the state must present some admissible evidence, testimonial or written, of the supervisor's purpose, i.e., purpose at the "programmatic level," in the words of *Edmond*.

*Id.* at 699 and 701, 556 S.E.2d at 897-98 and 899. *See also Jackson*, 99 N.Y.2d at 132, 782 N.E.2d at 71, 752 N.Y.S.2d at 275 (affirming the suppression of evidence seized at a roadblock after noting that the State

offered as evidence only the testimony of the officers who set up and manned the roadblock and that "[n]ever did the officers unequivocally point to a primary programmatic objective that would qualify under *City of Indianapolis*").

We, therefore, remand for the trial court to make findings of fact regarding the primary programmatic purpose of the checkpoint at issue, as required by *Edmond*. If the primary programmatic purpose of the checkpoint is not within one of the narrow exceptions to the prohibition against suspicionless seizures, but rather is for general crime control purposes, such as narcotics detection, then the "*Edmond*-type presumptive rule of unconstitutionality" applies. *Lidster*, 540 U.S. at 426, 157 L. Ed. 2d at 852, 124 S. Ct. at 890. If, however, the trial court finds that the primary programmatic purpose was constitutionally permissible, then the court must proceed to analyze the reasonableness of the checkpoint.

B. The Reasonableness of the Checkpoint

Even if the trial court on remand finds that the primary programmatic purpose was checking licenses and registration, its inquiry does not end with that finding. In its most recent opinion addressing checkpoints, the United States Supreme Court held that even if a checkpoint is for one of the permissible purposes, "[t]hat does not mean the stop is automatically, or even presumptively, constitutional. It simply means that we must judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances." *Id.* See *United States v. Huguenin*, 154 F.3d 547 (6th Cir. 1998) (holding that a DUI checkpoint, which is a permissible purpose for a checkpoint under *Sitz*, was unreasonable in how it was conducted and, therefore, unconstitutional).

To determine whether a seizure at a checkpoint is reasonable requires a balancing of the public's interest and an individual's privacy interest. *Brown v. Texas*, 443 U.S. 47, 50, 61 L. Ed. 2d 357, 361, 99 S. Ct. 2637, 2640 (1979) ("The reasonableness of seizures that are less intrusive than a traditional arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." (internal citations and quotation marks omitted)). The Court in *Lidster* reaffirmed the *Brown* three-part test for determining reasonableness: "[I]n judging reasonableness, we look to '[1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with indi-

vidual liberty.' " *Lidster*, 540 U.S. at 427, 157 L. Ed. 2d at 852, 124 S. Ct. at 890 (quoting *Brown*, 443 U.S. at 51, 61 L. Ed. 2d at 362, 99 S. Ct. at 2640).

The first *Brown* factor—the gravity of the public concerns served by the seizure—analyzes the importance of the purpose of the checkpoint. *Id.*, 157 L. Ed. 2d at 852, 124 S. Ct. at 891. This factor is addressed by first identifying the primary programmatic purpose as required by *Edmond* and then assessing the importance of the particular stop to the public. In *Lidster*, the Supreme Court found "[t]he relevant public concern was grave." *Id.* The Court explained: "Police were investigating a crime that had resulted in a human death. No one denies the police's need to obtain more information at that time. And the stop's objective was to help find the perpetrator of a specific and known crime, not of unknown crimes of a general sort." *Id.*

In considering the second factor—the degree to which the seizure advances the public interest—the Court in *Lidster* stressed that "[t]he police *appropriately tailored* their checkpoint stops to fit important criminal investigatory needs." *Id.* (emphasis added). The Court pointed to the police's selection of a time and location most likely to elicit information about the accident being investigated. *Id.* ("The stops took place about one week after the hit-and-run accident, on the same highway near the location of the accident, and at about the same time of night.").

In this case, even though the Supreme Court has previously suggested that license and registration checkpoints advance an important purpose, the trial court was required, and failed, to make findings whether the checkpoint was appropriately tailored to meet that purpose. The evidence currently in the record raises a serious question whether there was any tailoring at all. As mentioned above and as repeatedly stressed by one of the officers, these checkpoints were "spontaneous," without any prior agreement as to a starting time or finishing time. The officers apparently conducted a checkpoint whenever they felt like it. In addition, while the officers testified that the Narcotics Division officers and Deputy Ides jointly decided to set up the checkpoint on Queen's Haven Road, no evidence was presented to show why that road was picked or why they chose that particular stretch of road. This evidence, or lack thereof, raises serious questions whether the checkpoint was sufficiently tailored. Without tailoring, "it is possible that a roadblock purportedly established to check licenses would be located and conducted in such a way as to facilitate the detection of crimes unrelated to licensing. That risk can

**STATE v. ROSE**

[170 N.C. App. 284 (2005)]

be minimized by a requirement that the location of such a roadblock be determined by a supervisory official, considering where license and registration checks would likely be effective." 5 LaFave, *supra* § 10.8(a), at 347-48.

With respect to the third factor—the severity of the interference with individual liberty—the Supreme Court has focused on how the officers conducted the checkpoint, including the amount of discretion afforded the field officers. Specifically, as Chief Justice Burger wrote in *Brown*—a decision reaffirmed and applied by the Supreme Court in 2004 in *Lidster*—a checkpoint "must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown*, 443 U.S. at 51, 61 L. Ed. 2d at 362, 99 S. Ct. at 2640.[2] There must be orderly procedures to limit the "unfettered discretion of officers in the field" in order to avoid the "arbitrary invasion" of motorists' privacy interests. *Id.* The Supreme Court has stressed that "standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Prouse*, 440 U.S. at 661, 59 L. Ed. 2d at 672, 99 S. Ct. at 1400.

In this case, the only factor found by the trial court relating to a neutral limitation on the field officers is the fact that the officers stopped all oncoming traffic at the checkpoint, a circumstance that by itself is not enough to uphold a checkpoint. Whether the police stop every automobile is merely one factor in evaluating the reasonableness of a checkpoint: while stopping every car does eliminate discretion as to who the officers stop, it does not eliminate the discretion as to the officers' conduct during the stop. The issue is not just who is stopped, but what the field officers choose to do after the stop. *See* George C. Thomas III, *Terrorism, Race and a New Approach to*

---

2. In addition, the Court in *Lidster* relied heavily upon the holdings and analysis of *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 L. Ed. 2d 412, 110 S. Ct. 2481 (1990) (sobriety checkpoint) and *United States v. Martinez-Fuerte*, 428 U.S. 543, 49 L. Ed. 2d 1116, 96 S. Ct. 3074 (1976) (border check). Both cases found the degree of intrusion on the privacy of motorists acceptable because of the constraints imposed on field officers. *Sitz*, 496 U.S. at 453, 110 L. Ed. 2d at 422, 110 S. Ct. at 2487 ("Here, checkpoints are selected pursuant to the guidelines, and uniformed police officers stop every approaching vehicle."); *Martinez-Fuerte*, 428 U.S. at 559, 49 L. Ed. 2d at 1129, 96 S. Ct. at 3083 ("The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class.")

*Consent Searches*, 73 Miss. L.J. 525, 542 (2003) ("At a roadblock, or following a traffic stop, police can use race and only race to decide which cars merit further attention or which drivers to ask for consent to search their cars.").

The record contains evidence that suggests a lack of any limitation on the officers' discretion in the field apart from the requirement that they stop every car. In addition to the testimony quoted above—describing a lack of any prior plan for the "spontaneous" checkpoint—the officers also testified as follows:

Q. Does [sic] any of your supervisors come together for a meeting and say these are the people assigned to check driver's license check points on Queen's Haven Road, and give that assignment out?

A. No.

Q. Have they ever advised you of a plan of how far down the road it's going to be set up so everybody can see it?

A. No. We don't have those types of meetings. The only time we do anything like that is if we're assisting the State or something like that—one of the highway patrol check points.

. . . .

Q. You were in charge of this check point?

A. No.

Q. Who was in charge of the check point?

A. No one was really in charge. We're all detectives conducting the check point. No one individual officer was placed in charge.

There was also no evidence offered of any oral or written guidelines governing any aspect of Onslow County Narcotics Division checkpoints.

Additionally, the testimony of the officers described how this checkpoint was conducted without any form of supervision:

Q. Okay. When you mean by "spontaneously put them up", do your supervisors or any of the department heads, do they know there's a check point going on out there?

A. Not necessarily, no.

Q. Did they know on this evening?

A. No.

Q. They did not know there was a check point going on this evening?

A. Not—no, to my knowledge, anyway.

Neither of the other two witnesses testified to the contrary. There is testimony in the transcript that "the area first sergeant or the area deputy responsible for that area" would request checkpoints, but one would hardly expect a patrol sergeant or patrol deputy responsible for a particular geographic area to be supervisory to Narcotics Division detectives, including Detective Sergeants. Regardless, this is a factual question that should not be resolved by this Court—and provides a very slim reed for affirming the trial court below, especially when it never considered the question.[3]

In short, the evidence as it currently stands would permit the trial court to find that there was no plan, no time frame, no supervision, and no direction from anyone (oral or written) about how to conduct these wholly spontaneous checkpoints. Indeed, there was not even anyone in charge. If the trial court on remand finds this is in fact the case with the Onslow County checkpoint, it is difficult to imagine more unfettered discretion. *See Huguenin,* 154 F.3d at 562-63 (DUI checkpoint held unreasonable under *Brown* because the lack of orderly procedures meant field officers would be free to decide which motorists would be detained for further questioning with "the potential for randomly targeting individual motorists . . . great"); *State v. DeBooy,* 2000 UT 32, § 23, 996 P.2d 546, 551-52 (2000) ("According to testimony of the officers at the suppression hearing, there were no guidelines as to how their inquiry was to be conducted; it was left entirely to the discretion of the officers in the field. . . . Such unbridled discretion for the officers is inherently unreasonable under the Fourth Amendment . . . .").

The State, however, argues that *State v. Mitchell,* 358 N.C. 63, 592 S.E.2d 543 (2004) supports the trial court's order. The question before the Court in *Mitchell* was whether "the Fourth Amendment prohibits officers from conducting checkpoints without written guidelines." *Id.* at 67, 592 S.E.2d at 545. The Court, in answering this question, held

---

3. While there was evidence that the officers' captain "came out" to the checkpoint at some time, Sgt. Baumgarner confirmed, however, that the captain arrived after the arrest had occurred.

that "checkpoints conducted without written guidelines are [not] per se unconstitutional." *Id.* at 67, 592 S.E.2d at 546.

The Court in *Mitchell* upheld the checkpoint because "constitutionally sufficient restraints" on the officers' discretion were in place. *Id.* at 68, 592 S.E.2d at 546. After observing that "[h]ere adequate internal guidelines were testified to and implemented," *Id.* at 67, 592 S.E.2d at 546, the Court held that:

> [Officer] Falls' standing permission to set up checkpoints pursuant to Captain Jonas' oral guidelines and Officer Falls' call to his supervisor before creating the checkpoint at issue are constitutionally sufficient restraints to keep Falls from abusing his discretion. Because police officers are not constitutionally mandated to conduct driver's license checkpoints pursuant to written guidelines; because Officer Falls received sufficient supervisory authority to conduct the checkpoint; and because the officers stopped all oncoming traffic at the checkpoint, we conclude that the checkpoint was constitutional.

*Id.* Thus, when looking at the totality of the checkpoint's circumstances, the Court found sufficient restraints on the field officer's discretion to uphold the checkpoint. *Id.*

While our Supreme Court suggested in *Mitchell* that a lack of supervisory permission might not "merit a constitutionally mandated reversal in a roadblock case such as the one *sub judice*," *id.*, the case currently before this Court is not necessarily a case "such as the one" before the Supreme Court in *Mitchell*. Nothing in *Mitchell* indicates that our Supreme Court intended to authorize spontaneous, roving, unplanned, unsupervised, and unbounded checkpoints. We believe that *Mitchell* stands for the proposition that supervisory permission—like written guidelines, stopping every vehicle, and other factors—is not a "lynchpin," but instead is a circumstance to be considered as part of the totality of the circumstances in examining the reasonableness of a checkpoint. As the Court mandated in *Lidster*, a trial court must examine the checkpoint as a whole and "judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances" present with that checkpoint. *Lidster*, 540 U.S. at 426, 157 L. Ed. 2d at 852, 124 S. Ct. at 890.

Based on our review of the trial court's order, it appears that the trial court concluded that the checkpoint was reasonable based solely on the purpose of the checkpoint and the fact that the officers stopped every car. In doing so, the court addressed the first prong of

the *Lidster* analysis and part of the third prong. The court made no findings regarding the tailoring of the checkpoint to the purpose (the second prong) and failed to consider all of the circumstances relating to the discretion afforded the officers in conducting the checkpoint (the third prong). Accordingly, we remand for further findings as to each of the *Lidster* factors and a weighing of those factors to determine whether the checkpoint was reasonable.[4]

Reverse and remand.

Judge TYSON concurs.

Judge TIMMONS-GOODSON concurs in the result only in a separate opinion.

TIMMONS-GOODSON, Judge, concurring in the result.

"The scope of review on appeal of the denial of a defendant's motion to suppress is strictly limited to determining whether the trial court's findings of fact are supported by competent evidence, in which case they are binding on appeal, and in turn, whether those findings support the trial court's conclusions of law." *State v. Corpening*, 109 N.C. App. 586, 587-88, 427 S.E.2d 892, 893 (1993). In the instant case, because I believe the trial court's findings of fact are insufficient to support its ultimate conclusions of law, I agree with the holding reached by the majority.

———————

4. Because of our disposition of this appeal, we need not decide whether the officers possessed a reasonable and articulable suspicion to prolong the defendant's detention at the roadblock.