STATE OF NORTH CAROLINA v. JOHN ROSCOE NOLAN

No. COA10-518

(Filed 19 April 2011)

**1. Appeal and Error— preservation of issues—denial of second motion to dismiss**

The denial of a motion to dismiss evidence of illegal drugs seized from defendant and his car at a checkpoint was not properly before the Court of Appeals where a prior motion on the constitutionality of the checkpoint was denied and the second motion, on the seizure itself, was not ruled upon. Defendant did not challenge the trial court's failure to rule on the second motion or provide a reason for granting it not related to the first.

**2. Criminal Law— traffic checkpoint—primary programmatic purpose—constitutional**

The trial court properly determined that the primary programmatic purpose of a traffic checkpoint was constitutionally permissible when the evidence was considered in its entirety, including the written plan as well as the officers' conflicting testimony.

**3. Criminal Law— traffic checkpoint—constitutionally reasonable**

The trial court correctly determined that a traffic checkpoint was reasonable where the court applied the three-prong test of *Brown v. Texas*, 443 U.S. 47, and considered the gravity of the public concerns, the degree to which the public interest was advanced and to which the checkpoint was tailored to fit its primary purpose, and the severity of the interference with individual liberty.

Appeal by defendant from judgment entered 24 September 2009 by Judge James E. Hardin, Jr., in Forsyth County Superior Court. Heard in the Court of Appeals 27 October 2010.

*Attorney General Roy Cooper, by Assistant Attorney General John R. Green, Jr., for the State.*

*Benjamin D. Porter, for defendant-appellant.*

CALABRIA, Judge.

**STATE v. NOLAN**

[211 N.C. App. 109 (2011)]

John Roscoe Nolan[1] ("defendant") appeals the trial court's judgment for the offenses of possession with intent to sell or deliver marijuana, possession of drug paraphernalia, carrying a concealed weapon, and maintaining a vehicle or dwelling used for keeping and selling controlled substances. More specifically, defendant appeals the trial court's denial of his motion to suppress evidence. We affirm.

## I. BACKGROUND

At approximately 11:00 p.m. on 6 July 2007, law enforcement officers from the Kernersville Police Department ("KPD"), King Police Department, Winston-Salem Police Department, Forsyth County Sheriff's Department ("FCSD"), and the North Carolina Highway Patrol participated in a checking station ("the checkpoint") at the intersection of the 800 block of South Main Street and the 800 block of Old Winston Road, "a main thoroughfare" in Kernersville, North Carolina. The purpose of the checkpoint was "[t]o determine compliance with the Motor Vehicle Code." The ultimate goal of this combined effort was to reduce crashes, injuries, and deaths from impaired driving offenses.

Officer L.D. Griffith ("Officer Griffith") of the Traffic Enforcement Division of the KPD scheduled the checkpoint that was established pursuant to a written "Checking Station Plan" ("the plan"). Officer Griffith obtained a form memorandum from the Governor's Highway Safety Program ("the standard plan") which he adapted to serve as a checklist, and then submitted the memorandum regarding the plan to all participating law enforcement officers. The plan included the starting and ending times of the checkpoint. It was scheduled to start at 11:00 p.m. on 6 July 2007 and end at 3:00 a.m. on 7 July 2007. In addition to the times of operation, the plan described the procedures and equipment to be used. The plan also included briefing all participants regarding the procedures, equipment, location, and times of operation of the checkpoint. More importantly, the plan required the officers to stop every vehicle coming through the checkpoint. Once stopped, the officers were directed to ask every driver to produce his or her license and vehicle registration, then to tell the officer their destination.

On 7 July 2007 at midnight, Officer Griffith was present and supervised the checkpoint, and approximately thirty officers in

1. Documents in the record on appeal also identify defendant as "John Roscoe Nolen." However, since the trial court's judgment identifies defendant's last name as "Nolan," we refer to him in this opinion by that spelling.

**STATE v. NOLAN**

[211 N.C. App. 109 (2011)]

twenty to twenty-five marked patrol cars were assigned to the check-point. At that time, defendant drove a Pontiac Bonneville ("the vehicle") and was stopped at the checkpoint. Deputy J. Moore ("Deputy Moore") of the FCSD, one of the officers assigned to the checkpoint, approached defendant's vehicle and asked defendant for his license. As Deputy Moore spoke with defendant, he detected an odor of alcohol. Deputy Moore asked defendant "about the odor, and he said he had not been drinking." Deputy Moore then asked defendant "about . . . a six-pack of Budweiser Select" which Deputy Moore observed "in the back seat with two bottles missing." When Deputy Moore asked defendant about the missing bottles, defendant admitted he "had a couple earlier." Deputy Moore then asked defendant to exit the vehicle, and as defendant exited, Deputy Moore observed a "clip knife" on defendant's pocket. Deputy Moore then advised defendant that he was going to conduct a field sobriety test and asked defendant to "pull the stuff out of his pockets."

Defendant prepared for the field sobriety test by removing the objects from his pants pockets. As defendant removed a sunglasses case from his pants pocket, a second officer, Deputy J. Bracken ("Deputy Bracken") of the FCSD, who was assigned to the checkpoint, observed a plastic bag containing a substance which appeared to be marijuana. Deputy Bracken asked defendant, "What's the plastic baggie?" and defendant replied, "Uh, oh." Deputy Bracken searched defendant and the search revealed another plastic bag, a glass pipe, and a lighter. A K-9 officer approached with a K-9 dog, to detect the presence of drugs in the vehicle. When officers searched defendant's vehicle, they discovered multiple items of contraband, including drugs.

Defendant was arrested,[2] indicted, and later pled guilty to two counts of possession with intent to sell or deliver marijuana, possession of drug paraphernalia, carrying a concealed weapon, and maintaining a vehicle or dwelling used for keeping and selling controlled substances.[3]

Prior to defendant's guilty plea, defendant filed a motion to suppress evidence ("the first motion") in Forsyth County Superior Court. Defendant challenged the checkpoint, arguing that it "was not set up,

2. Defendant was not charged with DWI because he passed the field sobriety test.

3. The trial court dismissed the charges of possession of a Schedule II controlled substance and possession of a Schedule III controlled substance pursuant to his plea agreement with the State.

conducted or maintained pursuant to a valid programmatic purpose and its operation and management did not meet the constitutional requirements set out under the Fourth and Fourteenth Amendments to the United States Constitution . . . ." Furthermore, defendant asked the trial court: (1) to suppress all evidence obtained as a result of the stop and seizure and (2) to suppress any and all fruits of "said illegal stop."

A hearing on the first motion was held before the Honorable James E. Hardin, Jr. ("Judge Hardin"). Defendant did not present any evidence. Following the hearing, the trial court denied the first motion. In the order, the trial court found that defendant had not "alternatively and independently argued that the search of the [d]efendant and resulting seizure of contraband was illegal."

On 20 October 2009, defendant filed a second motion to suppress evidence ("the second motion") that was heard before the Honorable L. Todd Burke ("Judge Burke"). However, Judge Burke did not rule on the second motion. When defendant entered his guilty plea on 1 December 2009 before Judge Burke, defendant specifically reserved the right to appeal all constitutional issues raised including the constitutionality of the checkpoint and defendant's stop and seizure by all officers including Deputy Bracken.

On 7 December 2009, Judge Burke sentenced defendant to serve a minimum term of five months to a maximum term of six months in the custody of the North Carolina Department of Correction, suspended the sentence, and placed defendant on supervised probation for twelve months. Defendant appeals.

## II. STANDARD OF REVIEW

When reviewing a motion to suppress evidence, this Court determines whether the trial court's findings of fact are supported by competent evidence and whether the findings of fact support the conclusions of law. If supported by competent evidence, the trial court's findings of fact are conclusive on appeal, even if conflicting evidence was also introduced. However, conclusions of law regarding admissibility are reviewed *de novo.*

*State v. Wilkerson,* 363 N.C. 382, 433-34, 683 S.E.2d 174, 205 (2009) (internal citations omitted). "The question for review is whether the ruling of the trial court was correct and . . . whether the ultimate ruling was supported by the evidence." *State v. Austin,* 320 N.C. 276, 290, 357 S.E.2d 641, 650 (1987) (internal citation omitted). If the trial court's findings of fact support its conclusions of law, "the trial

court's conclusions of law are binding on appeal." *State v. West,* 119 N.C. App. 562, 565, 459 S.E.2d 55, 57 (1995) (citation omitted).

## III. INITIAL MATTERS

**[1]** The State, as an initial matter, urges this Court not to consider the second motion on the ground that defendant failed to obtain a ruling on the motion as required by N.C. R. App. P. 10(b)(1). We agree with the State that the second motion is not properly before us, but reach this conclusion for different reasons.

Defendant's first motion was heard by Judge Hardin. Defendant asserted that the checkpoint "was not set up, conducted or maintained pursuant to a valid programmatic purpose and its operation and management did not meet the constitutional requirements set out under the Fourth and Fourteenth Amendments to the United States Constitution . . . ." Defendant argued that the checkpoint was unconstitutional because its programmatic purpose was not to detect impaired drivers, as the State contended, but instead was "an unlawful multipurpose checkpoint geared towards general crime prevention and drug interdiction."

Judge Hardin denied the first motion and concluded that the checkpoint had a valid and appropriately tailored programmatic purpose: the detection of drivers operating a motor vehicle while impaired. In addition, Judge Hardin noted in his findings of fact:

> The Defendant confines his contentions and arguments to the alleged unconstitutionality of the stop of the Defendant and of the fruits of a resulting search that yielded seized contraband. In the event of a finding that the Driving While Impaired "Checking Station" was constitutional in its purpose and application, the Defendant has not alternatively and independently argued that the search of the Defendant and resulting seizure of the contraband was illegal.

Judge Hardin then explained that although "this court has made findings of fact sufficient to make these conclusions of law, this has not been done because of the parameters of the Defendant's contentions and arguments raised, and of the authorities cited." Judge Hardin, therefore, made no conclusions of law on any issue other than the constitutionality of the checkpoint. Judge Hardin concluded the checkpoint was constitutional and denied the first motion.

Defendant then filed the second motion, asserting that "the individual search and resulting seizure of the alleged contraband was illegal pursuant to the Fourth and Fourteenth Amendments to the United States Constitution . . . ." The second motion was heard by Judge Burke. Defendant's counsel argued to Judge Burke that Judge Hardin had left open the question whether, even though the checkpoint as implemented by the first officer (Deputy Moore) was constitutional, the individual search (conducted by Deputy Bracken) that followed the initial stop was unconstitutional. Based on that argument, Judge Burke concluded that because Judge Hardin "hasn't made a ruling on it, I'm going to have to hear it because [defendant's] asking that a ruling be made on it now."

After the parties addressed whether Judge Burke should hear testimony or whether Judge Hardin's factual findings were binding, it became clear that defendant's counsel was still focusing on the checkpoint. Defendant's counsel contended that Judge Hardin concluded that the programmatic purpose of the checkpoint was "fine," but then "invited . . . a secondary motion that the application of the checkpoint and the search that was done outside the realm of the checkpoint by Deputy Bracken was invalid." When Judge Burke pointed out that Judge Hardin had concluded that "there was nothing wrong with the checkpoint," defendant's counsel responded that the law requires both that the checkpoint have a proper programmatic purpose and that it be narrowly tailored. According to defendant's counsel, Judge Hardin had addressed only the programmatic purpose prong, but had left open the issue whether the checkpoint was narrowly tailored.

After defendant's counsel made it plain that in the second motion, defendant was still challenging an aspect of the checkpoint's constitutionality, Judge Burke pointed out that the constitutionality of the checkpoint had already been decided by Judge Hardin. He, therefore, concluded that he had no authority to hear the second motion since it would essentially require him to conclude that Judge Hardin had erred in ruling that the checkpoint was constitutional. Defendant then chose to plead guilty.

On appeal, while defendant quotes, in part, Judge Burke's explanation regarding why he did not believe that he had authority to decide the second motion, defendant never argues that Judge Burke erred in refusing to decide the second motion. Defendant challenges only Judge Hardin's ruling by asserting in appellant's brief, "Judge

Hardin's view that the checkpoint itself and the search of the defendant are distinct and separate transactions, is a hypertechnical view of the checkpoint." Defendant then confirmed that he still primarily challenged the constitutionality of the checkpoint:

> In the instant case, it is clear that the checkpoint was used to detect impaired drivers, but the actions of Deputies Moore and Bracken support a finding that the checkpoint had an impermissible purpose of general law enforcement or drug interdiction, as is further supported by the fact that the DWI checkpoint yielded four DWI arrests and one hundred (100) other violations.

With respect to any other Fourth Amendment violation apart from the checkpoint itself, defendant stated only, quoting Judge Hardin's finding of fact:

> In any event, appellant specifically alleged that the 'search and resulting seizure of contraband' was illegal in his second Motion to Suppress before Judge Burke. *For these reasons,* Appellant's Motion to Suppress was not defective for failing to 'alternatively and independently [argue] that the search of the defendant and resulting seizure of contraband was illegal.' "

(internal citation omitted and emphasis added). In the conclusion of his brief, defendant stated: "Because the appellant was illegally searched during the course of a DWI checkpoint, the checkpoint itself had an impermissible purpose and was unreasonable. Alternatively, because the appellant was illegally searched, the resulting seizure of contraband should have been suppressed. Therefore, appellant's Motion to Suppress should have been allowed."

Defendant's brief cannot be read as suggesting that Judge Burke erred in any respect or that anything further needed to be done as to the second motion. Instead, defendant seems to be arguing that Judge Hardin erred in finding that the first motion was inadequate. In making this argument, defendant curiously contends that the first motion was not inadequate because of language in the second motion that was never before Judge Hardin. The conclusion of his brief then refers to only one motion to suppress.

In addition, nowhere in defendant's brief does he present any argument or provide any explanation as to how he was "illegally searched" apart from the checkpoint and its alleged impermissible purpose. As Appellate Rule 28(b)(6) provides, "[i]ssues . . . in support

of which no reason or argument is stated, will be taken as abandoned." N.C. R. App. P. 28(b)(6) (2010). We cannot, after careful review of defendant's brief, see any place that defendant challenges the failure to rule on his second motion or provides a basis unrelated to the checkpoint on which the second motion should have been granted. Therefore, the second motion is not properly before us and all further references to "the trial court" will pertain to the proceedings before Judge Hardin.

## IV. CONSTITUTIONALITY OF THE CHECKPOINT

[2] Defendant argues that the trial court erred in denying the first motion. Defendant claims the "checkpoint was not set up, conducted or maintained pursuant to a valid programmatic purpose and its operation and management did not meet the constitutional requirements set out under the Fourth and Fourteenth Amendments to the United States Constitution . . . ." We disagree.

" '[P]olice officers effectuate a seizure when they stop a vehicle at a checkpoint.' As with all seizures, checkpoints conform with the Fourth Amendment only 'if they are reasonable.' " *State v. Rose*, 170 N.C. App. 284, 288, 612 S.E.2d 336, 339 (2005) (quoting *State v. Mitchell*, 358 N.C. 63, 66, 592 S.E.2d 543, 545 (2004)). "Thus, 'police may briefly detain vehicles at a roadblock checkpoint with out individualized suspicion, so long as the purpose of the checkpoint is legitimate and the checkpoint itself is reasonable.' " *State v. Jarrett*, —— N.C. App. ——, ——, —— S.E.2d ——, —— (2010) (quoting *State v. Veazey*, 191 N.C. App. 181, 184, 662 S.E.2d 683, 686 (2008) (citations omitted)).

> When considering a challenge to a checkpoint, the reviewing court must undertake a two-part inquiry to determine whether the checkpoint meets constitutional requirements. First, the court must determine the primary programmatic purpose of the checkpoint. . . . Second, if a court finds that police had a legitimate primary programmatic purpose for conducting a checkpoint . . . [the court] must judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances.

*Veazey*, 191 N.C. App. at 185-86, 662 S.E.2d at 686-87 (internal quotations and citations omitted).

### A. Primary Programmatic Purpose

"In considering the constitutionality of a checkpoint, the trial court must initially 'examine the available evidence to determine the

purpose of the checkpoint program.' " *State v. Gabriel,* 192 N.C. App. 517, 521, 665 S.E.2d 581, 585 (2008) (quoting *Rose,* 170 N.C. App. at 289, 612 S.E.2d at 339).

> Our Court has previously held that where there is no evidence in the record to contradict the State's proffered purpose for a checkpoint, a trial court may rely on the testifying police officer's assertion of a legitimate primary purpose. However, where there is evidence in the record that could support a finding of either a lawful or unlawful purpose, a trial court cannot rely solely on an officer's bare statements as to a checkpoint's purpose. In such cases, the trial court may not simply accept the State's invocation of a proper purpose, but instead must carr[y] out a close review of the scheme at issue. This type of searching inquiry is necessary to ensure that an illegal multi-purpose checkpoint [is not] made legal by the simple device of assigning the primary purpose to one objective instead of the other[.]

*Veazey,* 191 N.C. App. at 187, 662 S.E.2d at 687-88 (internal quotations and citations omitted). "[W]hen a trooper's testimony varies concerning the primary purpose of the checkpoint, the trial court is 'required to make findings regarding the actual primary purpose of the checkpoint and . . . to reach a conclusion regarding whether this purpose was lawful.' " *Gabriel,* 192 N.C. App. at 521, 665 S.E.2d at 585 (quoting *Veazey,* 191 N.C. App. at 190, 662 S.E.2d at 689).

In the instant case, Officer Griffith testified that the purpose of the checkpoint was "to stop subjects from driving while impaired." He also testified that officers were to check drivers' licenses to make sure they were current, and that if drivers were "in violation of their registration being out or their license [was] expired or suspended, [they would be charged] as well." However, on cross-examination, Officer Griffith stated that officers at the checkpoint would be looking for weapons and "other criminal" violations, such as drug violations and stolen vehicles. Additionally, Officer Griffith stated that during the checkpoint, one officer would approach a stopped vehicle while a second officer would approach and "look for other violations of the law," including observing whether there were drugs "in plain sight."

Additional testimony was presented by Deputy Bracken, who assisted Deputy Moore. Deputy Bracken explained that his purpose was "to check and make sure there was [sic] no weapons or no obvious threats in the car," and that a FCSD narcotics K-9 officer was present at the checkpoint. "Because variations existed in [the officers'] testi-

mony regarding the primary purpose of the checkpoint, the trial court was required to make findings regarding the actual primary purpose of the checkpoint." *Jarrett,* —— N.C. App. at ——, —— S.E.2d at ——.

During Officer Griffith's testimony on direct examination, the State introduced, without objection, the written "Checking Station Plan" ("Exhibit 1"). Officer Griffith testified that he was the officer who created Exhibit 1, and that he was the officer in charge at the checkpoint. He further testified that Exhibit 1 had not been changed or altered in any way since 6 July 2007. According to Officer Griffith's testimony, Exhibit 1 included: (1) the location of checkpoint at the 800 block of South Main Street and the 800 block of Old Winston Road in Kernersville; (2) the times of operation of the checkpoint from 11:00 p.m. on 6 July 2007 until 3:00 a.m. on 7 July 2007; (3) the procedures to be followed, such as stopping every vehicle entering the checkpoint; and (4) the equipment to be used, such as posting signs in advance of the checkpoint to notify approaching drivers of the checkpoint, and activating blue lights. The plan was distributed to all participating law enforcement agencies, and Officer Griffith, as the supervising officer, was the only officer authorized to approve changes to the plan.

Furthermore, Officer Griffith testified that Exhibit 1 directed the officers to determine whether the addresses on the driver's license and registration matched the information available, and whether the presented license was valid or revoked when a vehicle was stopped at the checkpoint. Officers would also check for an odor of alcohol or marijuana, and observe other physical characteristics such as slurred speech or glassy eyes. If all information was current and valid and the officers were not concerned about any driver's noncompliance with the Motor Vehicle Code, officers would return the driver's license and registration and the driver was free to leave. Officer Griffith testified that in situations where the officers were satisfied, the entire encounter would take approximately fifteen to twenty seconds.

Although the officers offered conflicting testimony on the purpose of the checkpoint, Officer Griffith's testimony must be viewed along with Exhibit 1. When the officers' testimony is supplemented by a written plan, then the evidence must be viewed in its entirety. When viewed in the entirety, the evidence supports the trial court's finding that the officers complied with the written checkpoint plan conducted pursuant to a memorandum titled "Checking Station Plan" and prepared by Officer Griffith from the "standard plan" adapted

from the Governor's Highway Safety Program. The trial court also found that: (1) Officer Griffith, a supervising officer, was present; (2) all cars coming through the checkpoint were stopped; (3) only Officer Griffith had the ability or authority to alter the plan or its execution; (4) the plan was not altered in any way except for an "inconsequential adjustment" of the exit from I-40 as directed by Officer Griffith; (5) signs were set out in advance of the checkpoint alerting drivers of the checkpoint; (6) stationary and temporary lighting illuminated the checking station; (7) the blue lights were activated on all law enforcement vehicles; (8) the drivers of all vehicles stopped at the checkpoint were asked for their license, registration, and destination; and (9) when the officers checked the drivers' licenses presented, the drivers were asked whether the addresses matched information available, and whether the presented license was valid or in revocation. At the time the officers followed the procedures in the plan, they also checked drivers for an odor of alcohol. Furthermore, the trial court found that the stated purpose of the plan was to "determine compliance with the Motor Vehicle Code" and that the ultimate goal of the checkpoint was to "reduce crashes; injuries and deaths all contributed (sic) to impaired driving offenses."

As a result of these findings, the trial court concluded that the primary programmatic purpose of the checkpoint was "the detection of drivers operating a motor vehicle while impaired and that the 'procedure was not merely to further general crime control.' " (internal citation omitted). Our Courts have upheld checkpoints where it found that a checkpoint's lawful primary purpose was designed to "uncover drivers' license and vehicle registration violations," *Veazey*, 191 N.C. App. at 189, 662 S.E.2d at 689, and detect intoxicated drivers, *Veazey*, 191 N.C. App. at 185, 662 S.E.2d at 686. Therefore, the trial court properly determined the primary programmatic purpose of the checkpoint was constitutionally permissible.

### B. Reasonableness

**[3]** "Although the trial court concluded that the checkpoint had a lawful primary purpose, 'its inquiry does not end with that finding.' " *Jarrett*, —— N.C. App. at ——, —— S.E.2d at —— (quoting *Rose*, 170 N.C. App. at 293, 612 S.E.2d at 342). "Instead, the trial court must still determine 'whether the checkpoint itself was reasonable.' " *Id.* at ——, —— S.E.2d at (quoting *Veazey*, 191 N.C. App. at 191, 662 S.E.2d at 689-90).

"To determine whether a seizure at a checkpoint is reasonable requires a balancing of the public's interest and an individual's pri-

vacy interest." *Rose*, 170 N.C. App. at 293, 612 S.E.2d at 342. "In order to make this determination, this Court has required application of the three-prong test set out by the United States Supreme Court in *Brown v. Texas*, 443 U.S. 47, 50, 61 L. Ed. 2d 357, 361, 99 S. Ct. 2637, 2640 (1979)." *Jarrett*, —— N.C. App. at ——, —— S.E.2d at —— (citing *Rose*, 170 N.C. App. at 293, 612 S.E.2d at 342). "Under *Brown*, the trial court must consider '[1] the gravity of the public concerns served by the seizure[;] [2] the degree to which the seizure advances the public interest[;] and [3] the severity of the interference with individual liberty.' " *Id.* at ——, S.E.2d at —— (quoting *Rose*, 170 N.C. App. at 293-94, 612 S.E.2d at 342 (internal quotations and citation omitted)).

### 1. The gravity of the public concerns

"The first *Brown* factor—the gravity of the public concerns served by the seizure—analyzes the importance of the purpose of the checkpoint. This factor is addressed by first identifying the primary programmatic purpose . . . and then assessing the importance of the particular stop to the public." *Rose*, 170 N.C. App. at 294, 612 S.E.2d at 342.

> Both the United States Supreme Court as well as our Courts have suggested that license and registration checkpoints advance an important purpose. The United States Supreme Court has also noted that states have a vital interest in ensuring compliance with other types of motor vehicle laws that promote public safety on the roads.

*Veazey*, 191 N.C. App. at 191, 662 S.E.2d at 690 (internal quotations and citations omitted). In *Veazey*, we held that a checkpoint that was operated for the purpose of checking drivers' licenses would not violate the Fourth and Fourteenth Amendments. *Id.* at 185, 662 S.E.2d at 686. In addition, we note that "[i]nvestigating officers may take such steps as are reasonably necessary to maintain the status quo and to protect their safety during an investigative stop." *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988). As previously noted, the trial court determined that the primary programmatic purpose of the checkpoint was constitutionally permissible.

When the officers stopped defendant and asked him for his license, the officers performed the primary purpose of the checkpoint. As Deputy Moore spoke with defendant, he detected an odor of alcohol and observed two beer bottles missing from a six-pack in defendant's back seat. Defendant then admitted to Deputy Moore that

he consumed alcohol earlier that evening. Deputy Moore then asked defendant to exit the vehicle to perform a field sobriety test. Deputy Moore's actions were consistent with the trial court's conclusion that the checkpoint was also designed to detect "drivers operating a motor vehicle while impaired."

When Deputy Moore noticed defendant was carrying a small knife, he asked defendant about a bulge in defendant's pants pocket. Defendant then emptied his pockets, and Deputy Bracken observed in plain view a clear bag containing a substance which he believed to be marijuana. Although defendant was not charged with driving while impaired, he possessed a weapon, drugs, and drug paraphernalia. The actions taken by Deputies Moore and Bracken were reasonably necessary to maintain their safety during the operation of the checkpoint. The trial court properly concluded "that upon a consideration of the individual circumstances as applied to the subject case and of the applicable factors regarding the reasonableness of the [checkpoint] . . . the gravity of the public concerns [are directly] served by the seizure." Therefore, "the checkpoint adequately satisfied the requirements of the first prong of *Brown*." *Jarrett*, —— N.C. App. at ——, —— S.E.2d at ——.

2. The degree to which the seizure advanced public interests

"Under the second *Brown* prong—the degree to which the seizure advanced public interests—the trial court was required to determine 'whether [t]he police appropriately tailored their checkpoint stops to fit their primary purpose.' " *Id.* at ——, —— S.E.2d at —— (quoting *Veazey*, 191 N.C. App. at 191, 662 S.E.2d at 690) (internal quotations and citation omitted).

> Our Court has previously identified a number of non-exclusive factors that courts should consider when determining whether a checkpoint is appropriately tailored, including: whether police spontaneously decided to set up the checkpoint on a whim; whether police offered any reason why a particular road or stretch of road was chosen for the checkpoint; whether the checkpoint had a predetermined starting or ending time; and whether police offered any reason why that particular time span was selected.

*Veazey*, 191 N.C. App. at 191, 662 S.E.2d at 690.

In the instant case, the trial court's order found as fact, supported by Officer Griffith's testimony and Exhibit 1, that: (1) the checkpoint was established pursuant to a memorandum published on 6 July 2007,

which was prepared from the "standard plan" of the Governor's Highway Safety program website and without material changes except as to date, time and agencies involved, by the officer in charge, Officer Griffith, and with the designated subject described as "Checking Station Plan," and that the memorandum was admitted as evidence in a *voir dire* evidentiary hearing as State's Exhibit 1; (2) the checkpoint was conducted on a main thoroughfare of . Kernersville and the location was selected, "taking into account the likelihood of detecting impaired drivers, the traffic conditions, the number of vehicles that would likely be stopped and the convenience and safety of the motoring public"; and (3) the checkpoint had a predetermined starting time of 11:00 p.m. on 6 July 2007 and a predetermined ending time of 3:00 a.m. on 7 July 2007. "While these findings do not necessarily address all of the non-exclusive factors suggested by *Veazey*, they do indicate that the trial court considered appropriate factors to determine whether the checkpoint was sufficiently tailored to fit its primary purpose, satisfying the second *Brown* prong." *Jarrett*, —— N.C. App. at ——, —— S.E.2d at ——.

### 3. The severity of the interference with individual liberty

"The final *Brown* factor to be considered is the severity of the interference with individual liberty." *Id.* at ——, —— S.E.2d at ——. "[C]ourts have consistently required restrictions on the discretion of the officers conducting the checkpoint to ensure that the intrusion on individual liberty is no greater than is necessary to achieve the checkpoint's objectives." *Veazey*, 191 N.C. App. at 192, 662 S.E.2d at 690-91.

> Courts have previously identified a number of non-exclusive factors relevant to officer discretion and individual privacy, including: the checkpoint's potential interference with legitimate traffic; whether police took steps to put drivers on notice of an approaching checkpoint; whether the location of the checkpoint was selected by a supervising official, rather than by officers in the field; whether police stopped every vehicle that passed through the checkpoint, or stopped vehicles pursuant to a set pattern; whether drivers could see visible signs of the officers' authority; whether police operated the checkpoint pursuant to any oral or written guidelines; whether the officers were subject to any form of supervision; and whether the officers received permission from their supervising officer to conduct the checkpoint[.]

*Id.* at 193, 662 S.E.2d at 691. "Our Court has held that these and other factors are not "'lynchpin[s],'" but instead [are] circumstance[s] to be

considered as part of the totality of the circumstances in examining the reasonableness of a checkpoint.' " *Id.* (quoting *Rose*, 170 N.C. App. at 298, 612 S.E.2d at 345).

In the instant case, the trial court considered all of the relevant factors under the third *Brown* prong. These findings included: (1) the checkpoint's location at the intersection of the 800 block of South Main Street and the 800 block of Old Winston Road in Kernersville, North Carolina, was predetermined and took into account the traffic conditions, the number of vehicles that would likely be stopped and the convenience and safety of the motoring public, and there was an adjustment to include the exit from the Interstate 40 Highway since some drivers were turning around to avoid the checkpoint; (2) the steps taken to put drivers on notice of the approaching checkpoint were that signs were set out at the checkpoint alerting all drivers to the checkpoint ahead; (3) the location for the checkpoint was selected and directed by Officer Griffith; (4) in accordance with the plan developed from the Governor's Highway Safety Program, every vehicle was stopped and each driver was asked for a driver's license and registration; (5) drivers could see visible signs of the officers' authority because approximately thirty law enforcement officers, in twenty to twenty-five marked patrol cars with their blue lights flashing, were positioned at the checkpoint, and also stationary and temporary lighting was used to illuminate the area of the checkpoint; (6) all participating law enforcement officers operated the checkpoint pursuant to the written plan, which included Officer Griffith's briefing all participants regarding the procedures, equipment, location, and times of operation of the checkpoint; (7) Officer Griffith was the "Officer-in-Charge" and the supervisor of all the officers participating in the checkpoint; and (8) officers from five separate law enforcement agencies cooperated to conduct the checkpoint and agreed to follow the plan. Officer Griffith remained in control of the checkpoint at all times. "These findings indicate the trial court adequately considered the appropriate factors under the third prong of *Brown*." *Jarrett,* —— N.C. App. at ——, —— S.E.2d at ——.

"The trial court's order denying defendant's motion to suppress contained adequate findings of fact, supported by competent evidence, to satisfy the three prongs of the *Brown* test." *Id.* at ——, —— S.E.2d at ——. These findings in turn support the trial court's conclusions of law that "the degree to which the seizure advances the public interest [are substantial and significantly outweigh] [] the severity of the interference with individual liberty" and "the [checkpoint], as

composed and implemented was not an unreasonable detention of drivers entering the subject checkpoint or of the Defendant in these circumstances . . . ." The trial court correctly determined that the KPD had a legitimate primary programmatic purpose for conducting a checkpoint and that the checkpoint was reasonable under the circumstances. Defendant's issue on appeal is overruled.

## V. CONCLUSION

Judge Hardin's findings of fact were based upon competent evidence and supported the conclusion of law that the checkpoint, did not violate defendant's Fourth and Fourteenth Amendment rights. Therefore, the trial court properly denied the first motion. Defendant never challenged Judge Burke's failure to rule on the second motion or provided a basis unrelated to the checkpoint on which the second motion should have been granted. This issue is abandoned.

Affirmed.

Judges HUNTER, Robert C. and GEER concur.