OPINION OF THE COURT
 

 Levine, J.
 

 This case presents our third occasion in as many years to determine the validity under the Fourth Amendment of a suspicionless police stop of a motor vehicle
 
 (see People v Abad, 98
 
 NY2d 12 [2002];
 
 Matter of Muhammad F.,
 
 94 NY2d 136 [1999],
 
 cert denied
 
 531 US 1044 [2000]).
 

 On November 16, 1996, at about 8:15 p.m., members of the Street Crime Unit of the New York City Police Department set up a roadblock at 133rd Street and 12th Avenue in Manhattan, and at 9:30 stopped the vehicle in which defendant and another person were passengers. While a sergeant spoke to the driver, another officer directed his flashlight into the car and saw a clear plastic bag containing a hard white substance, which he recognized as cocaine. The officer also spotted a brown paper bag on the floor near the other passenger’s feet. The officer signaled to the sergeant that he had seen something, and all three individuals were removed from the car. The officer picked up the bags he had seen and, after confirming his identification of the substance in the first bag, arrested defendant and both other occupants.
 

 Defendant was indicted for criminal possession of a controlled substance in the first and third degrees, and moved to suppress the evidence seized from the vehicle. Two officers participating in the roadblock testified at the suppression hearing, offering numerous reasons why that checkpoint procedure was instituted that evening. The arresting officer — Officer Arthur Schroeder — testified that the roadblock was established within the precinct in response to a recent increase in crime, including carjackings and robberies of taxi and livery cabs. He also reaffirmed his testimony before the grand jury that there were additional safety objectives, including substantiating currently valid safety inspections, licenses and registrations.
 

 
 *128
 
 The senior officer responsible for initiating the roadblock, Sergeant James Gildea, explained that he decided to set it up after receiving daily criminal reports from headquarters detailing “particular crimes such as shootings, homicides, cab robberies, assault on cab drivers and carjackings and based on this information, that particular area of Manhattan North was [being] subjected to a large amount of violent crime.” He added that the exact location was selected because it “fwa]s the main thoroughfare for cars leaving that region.” Sergeant Gildea also testified that the roadblock was put in place to “educate * * * cab drivers” concerning the increase in robberies and shootings, “to suppress crime” and to interdict “[d]rugs and guns.” Significantly, both Officer Schroeder and Sergeant Gildea testified that the procedure was in operation for only about an hour and a half, and was dismantled approximately five minutes after defendant’s arrest for drug offenses.
 

 Supreme Court concluded that the vehicle stop was valid and denied defendant’s motion to suppress. Defendant then pleaded guilty to criminal possession of a controlled substance in the second degree. The court sentenced defendant, as a second felony offender, to a term of six years to life. On defendant’s appeal, the Appellate Division reversed, vacated the judgment and dismissed the indictment (see 285 AD2d 416). A Judge of this Court granted leave to appeal.
 

 Discussion
 

 In
 
 Matter of Muhammad F.
 
 (94 NY2d 136), we reviewed a New York City Police Department program which involved random suspicionless stops of taxi and livery vehicles in targeted neighborhoods. The practice was established to combat taxi and livery cab robberies following a dramatic increase of those particular crimes in the geographical area. The program permitted officers, who were in plainclothes and using unmarked police cars on a roving patrol, to make such stops at their own discretion. Evidence indicated that such officers directed passengers to step out of the vehicle in order to search it.
 

 Noting that even a brief, suspicionless stop of an automobile nonetheless qualifies as a seizure within the meaning of the Fourth Amendment, we followed Supreme Court jurisprudence in determining whether such a seizure is reasonable and, thus, constitutional by “a weighing of ‘[1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the
 
 *129
 
 interference with individual liberty’ ”
 
 (id.
 
 at 142 [quoting
 
 Brown v Texas,
 
 443 US 47, 51 (1979)]). We did not question the gravity of the concern served by the program, but concluded that the other elements of the test were not met. We found the program fatally flawed by the absence of a plan embodying explicit neutral limitations on the discretion of individual officers involved in the stops.
 

 By contrast, in
 
 People v Abad
 
 (98 NY2d 12), we concluded that the modified New York City program to address crimes against taxi and livery cab drivers — referred to as the Taxi/ Livery Robbery Inspection Program (TRIP) — passed constitutional muster. Notably, cab owners electing to participate in TRIP displayed a decal stating “this vehicle may be stopped AND VISUALLY INSPECTED BY THE POLICE AT ANY TIME TO ENSURE driver’s safety”
 
 {id.
 
 at 15). Under TRIP guidelines, spelled out in a written Police Department operations order, police were permitted to briefly stop and visually inspect a vehicle bearing TRIP decals. In
 
 Abad
 
 we credited the gravity of the public interest in preventing crimes against livery cab drivers — the first prong served by the program — and turned to the remaining two prongs of the
 
 Brown v Texas
 
 analysis. We concluded that the seizure advanced the public interest (the “effectiveness” factor) and that the structure of the program reduced the intrusiveness of the stops, both objectively and subjectively. Moreover, the officers’ discretion in the field was “significantly constrained by the limitation of the program to “participating vehicles”
 
 {id.
 
 at 18). Thus, we held that the TRIP program was constitutional under the Fourth Amendment.
 

 While defendant’s initial appeal was pending, the Supreme Court of the United States decided
 
 City of Indianapolis v Edmond
 
 (531 US 32 [2000]).
 
 City of Indianapolis
 
 involved a program in which the police operated checkpoints on roadways for the express purpose of interdicting illegal drug traffic into the City. A six-Justice majority of the Supreme Court held that the suspicionless stops at the checkpoints violated the Fourth Amendment because their primary purpose was essentially to serve the governmental interest in general crime control.
 

 In its decision in the present case, the Appellate Division assumed without deciding that the roadblock was not barred by
 
 City of Indianapolis,
 
 but concluded that suppression was required because the People failed to demonstrate with specificity the gravity of the public concern that would be served by the roadblock, the first prong of the
 
 Brown v Texas/Matter of Muhammad F.
 
 inquiry
 
 (see
 
 285 AD2d at 417). We agree that
 
 *130
 
 the stop in this case was constitutionally invalid, but on the ground that it violated the holding in
 
 City of Indianapolis.
 

 In
 
 City of Indianapolis,
 
 the City argued that all three prongs of the
 
 Brown v Texas
 
 test were met: that the influx of drugs and the resultant increased incidence of drug-related crimes were matters of grave public concern, that the stops appropriately advanced that public interest and that the interference with personal liberty was minimized. Moreover, the program was implemented under a plan limiting the discretion of the officers in the field.
 

 The Supreme Court majority in
 
 City of Indianapolis
 
 accepted all of the factual premises of the City’s position. In reviewing the Court’s suspicionless vehicle stop precedents, however, it noted that a suspicionless roadblock stop to uncover ordinary criminal wrongdoing had never been upheld. “Rather, pur checkpoint cases have recognized only
 
 limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion” (id.
 
 at 41 [emphasis supplied]). It was manifest to the
 
 City of Indianapolis
 
 majority that if the public interest/grave concern prong of the
 
 Brown v Texas
 
 test could be satisfied by reference to general crime control, the exceptions would inevitably swallow up the general rule that vehicle stops require “some measure of individualized suspicion”
 
 (id.).
 
 Otherwise, “there would be little check on the ability of the authorities to construct roadblocks for almost any conceivable law enforcement purpose”
 
 (id.
 
 at 42). Thus, the majority reasoned that
 

 “the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose. Rather, in determining whether individualized suspicion is required, we must consider the nature of the interests threatened
 
 and
 
 their connection to the particular law enforcement practices at issue. We are particularly reluctant to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends.”
 
 (Id.
 
 at 42-43.)
 

 Accordingly, the Court held that, no matter how well a checkpoint program employed safeguards to prevent abusive police practices, the ends of general crime control ordinarily cannot justify vehicle stops on less than individualized suspicion.
 

 
 *131
 
 Although the dissenters in
 
 City of Indianapolis
 
 portrayed the majority holding as the creation of a new “primary purpose” test for the validity of suspicionless vehicle stops, we read the decision essentially as a refinement of the grave public interest/ concern prong of the
 
 Brown v Texas
 
 balancing process. The
 
 City of Indianapolis
 
 decision instructs us on the focus of the necessary inquiry: “we must consider the
 
 nature
 
 of the
 
 interests threatened
 
 and their connection to the particular law enforcement practices at issue. * * * [W]e must look more closely at the nature of the
 
 public interests
 
 that such a regime is designed principally to serve” (531 US at 42-43 [emphasis supplied]).
 

 The relationship of the
 
 City of Indianapolis
 
 holding to the first
 
 Brown v Texas
 
 factor is also evident in the majority’s view that it flowed from the Court’s precedents identifying the governmental interest of protecting the integrity of national borders and highway safety as legitimate objectives for roadblock procedures
 
 (see id.
 
 at 37-38 [citing
 
 United States v Martinez-Fuerte,
 
 428 US 543 (1976), and
 
 Michigan Dept. of State Police v Sitz,
 
 496 US 444 (1990)]). Those cases involved nothing beyond applications of the
 
 Brown v Texas
 
 criteria to review suspicionless vehicle stops. Additionally, the
 
 City of Indianapolis
 
 ruling relied heavily
 
 (see
 
 531 US at 41-42) on a footnote in
 
 Delaware v Prouse
 
 (440 US 648, 659 n 18 [1979]), in which “controlling automobile thefts” was rejected as a legitimate first-prong governmental concern for
 
 Brown v Texas
 
 analysis because that interest “is not distinguishable from the
 
 general interest
 
 in crime control” (emphasis supplied).
 

 Further support for this reading of
 
 City of Indianapolis
 
 is that, relying on the three-prong analysis of the roadblock stop precedents, the defense here clearly anticipated the
 
 City of Indianapolis
 
 ruling. In arguing that the stop violated the Fourth Amendment, the defense attacked the wide assortment of objectives the police ostensibly sought to achieve from the roadblock and explicitly objected that a concern based only upon a “generalized problem with increase of crime in a general area” was constitutionally insufficient to justify the roadblock procedure employed here. Thus, the
 
 City of Indianapolis
 
 holding is squarely before us under a preserved objection and is controlling authority.
 

 Under the holding in
 
 City of Indianapolis,
 
 the People have the burden of establishing that the primary
 
 programmatic
 
 
 *132
 
 objective (not the subjective intent of the participating officers) for initiating a suspicionless vehicle stop procedure was not merely to further general crime control
 
 (see
 
 531 US at 47-48).
 
 [1]
 
 The Court did not undertake comprehensively to delineate the kinds of particularized governmental interests for which suspicionless stops could be utilized. The Court noted that they could encompass “a smaller class of offenses * * * [where] society [is] confronted with [a] type of immediate, vehicle-bound threat to life and limb”
 
 (id.
 
 at 43). Furthermore, the Court in
 
 City of Indianapolis
 
 held that a qualifying secondary purpose of the police in setting up a roadblock would not serve to validate suspicionless stops primarily motivated by general crime control ends
 
 (see id.
 
 at 47).
 

 We conclude that the roadblock stop of defendant’s vehicle contravened the Fourth Amendment under the teaching of
 
 City of Indianapolis v Edmond.
 
 The suppression hearing testimony of the officers who set up and manned the roadblock where defendant’s vehicle was stopped pointed to a series of unprioritized purposes — among others, to reduce crime, educate cab drivers, prevent taxicab robberies and carjackings, and interdict drugs and guns. It is self-evident that many of these objectives were related only to general crime control. Never did the officers unequivocally point to a primary programmatic objective that would qualify under
 
 City of Indianapolis,
 
 such as addressing some “type of immediate, vehicle-bound threat to life and limb”
 
 (City of Indianapolis
 
 at 43). Indeed, the suppression court in its decision could characterize the purpose of the roadblock only as that of “providing access to a large number of automobiles, even a large number of automobiles that might have occupants
 
 involving one or more form[s] of criminal activ
 
 ity” (emphasis supplied).
 
 [2]
 
 Thus, the suspicionless stop here was invalid under
 
 City of Indianapolis v Edmond,
 
 and the evidence seized as a result thereof was properly suppressed.
 

 
 *133
 
 Accordingly, the order of the Appellate Division should be affirmed.
 

 Chief Judge Kaye and Judges Smith, Ciparick, Wesley, Rosenblatt and Graffeo concur.
 

 Order affirmed.
 

 [1]
 

 . The Court, however, recognized that in emergency situations, even a general crime control purpose might suffice, such as a “roadblock set up to thwart an imminent terrorist attack or to catch a dangerous criminal who is likely to flee by way of a particular route”
 
 (id.
 
 at 44).
 

 [2]
 

 . The People only retrospectively suggested that the prevention of taxi and livery cab robberies and carjackings was the primary objective of the police. As previously described, however, this was neither the purport of the express testimony of the police nor of the finding of the suppression court. Thus, this is not the occasion to decide whether, had that been the primary objective, it would meet the requirements of
 
 City of Indianapolis.