[810 NYS2d 610]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v FABIAN V.
TROTTER, Respondent.

Fourth Department, February 3, 2006

APPEARANCES OF COUNSEL

*Michael C. Green, District Attorney,* Rochester (*Kelly Christine Wolford* of counsel), for appellant.

*Edward J. Nowak, Public Defender,* Rochester (*Drew R. Du Brin* of counsel), for respondent.

**OPINION OF THE COURT**

HURLBUTT, J.

The People appeal from an order suppressing cocaine and marihuana seized by law enforcement officers during the stop of defendant's vehicle at a programmatic traffic checkpoint in the target area of a law enforcement initiative seeking to address violent crime and drug trafficking. The issue before us is whether the seized items were properly suppressed based on the violation of defendant's Fourth Amendment rights under *Indianapolis v Edmond* (531 US 32 [2000]). Because the evidence presented at the suppression hearing fully supports Supreme Court's determination that the primary purpose of the checkpoint at which defendant was stopped was "general crime control" (*id.* at 43), we conclude that the order should be affirmed and thus that the indictment should be dismissed.

I

On October 26, 2002, defendant's vehicle was stopped by law enforcement officers conducting a traffic checkpoint at the intersection of Main Street and Jefferson Avenue in Rochester. The record establishes that the checkpoint was conducted as an integral component of the "Rochester Initiative," a law enforcement tactical unit utilizing the combined efforts of the Rochester Police Department, the State Police, and the Monroe County Sheriff's Department. According to the suppression hearing testimony of the lieutenant in the Rochester Police Department in charge of the tactical unit, the task of the tactical unit was to deter violent crimes and drug trafficking in an identified target area of Rochester known as the "crescent." One of the strategies employed by the tactical unit was to conduct traffic checkpoints within the target area, which included the intersection involved herein.

The Trooper who stopped defendant's vehicle testified at the suppression hearing that he was one of the 12 to 14 law enforcement officers participating in the checkpoint at Main Street and Jefferson Avenue on October 26, 2002. The checkpoint procedure was to stop every passing vehicle and to check all wind-

shield stickers, driver's licenses and registrations. Upon stopping defendant's vehicle at 9:10 P.M. on October 26, 2002, the Trooper asked defendant for his driver's license and registration. As defendant reached to his right, the Trooper looked inside the vehicle and observed a plastic baggie in an open compartment in the driver's door. The baggie contained what appeared to be cocaine. Defendant was arrested, and the plastic baggie and a marihuana cigarette found in defendant's hand were seized.

Defendant was subsequently charged by indictment with, inter alia, criminal possession of a controlled substance in the fifth degree (Penal Law § 220.06 [5]) and unlawful possession of marihuana (Penal Law § 221.05). Following a hearing conducted on that part of defendant's omnibus motion seeking suppression of tangible evidence, the court suppressed the cocaine and marihuana on the ground that they had been seized in violation of defendant's Fourth Amendment rights. Specifically, the court determined that the primary purpose of the traffic checkpoint at which defendant was stopped was general crime control, and thus the stop of defendant at the checkpoint was unconstitutional under *Edmond*. Having filed the requisite statement pursuant to CPL 450.50, the People appeal, contending that the court erred in determining that the primary purpose of the checkpoint was general crime control.

## II

Our analysis begins with the basic proposition that, as a general rule, a seizure must be predicated on an "individualized suspicion" of wrongdoing in order to be deemed reasonable under the Fourth Amendment (*Chandler v Miller*, 520 US 305, 308 [1997]; *see Commonwealth v Buchanon*, 122 SW3d 565, 568 [Ky 2003]). It is of course well settled that a highway stop of a vehicle at a police roadblock or checkpoint constitutes a seizure within the meaning of the Fourth Amendment (*see Michigan Dept. of State Police v Sitz*, 496 US 444, 450 [1990]; *United States v Martinez-Fuerte*, 428 US 543, 556 [1976]). The United States Supreme Court has recognized, however, that certain routinized roadblock stops conducted for a limited purpose are constitutionally permissible, without the requirement of individualized suspicion (*see Sitz*, 496 US at 455 [roadblocks to detect intoxicated drivers permissible]; *Delaware v Prouse*, 440 US 648, 663 [1979] [random vehicle stops unreasonable under Fourth Amendment, but standardized roadblock stops of traffic

to check for driver's licenses and registrations suggested to be reasonable]; *Martinez-Fuerte*, 428 US at 545 [border patrol checkpoint consistent with Fourth Amendment]). The Supreme Court has applied a three-part test to determine the reasonableness of a suspicionless roadblock stop, i.e., "a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty" (*Brown v Texas*, 443 US 47, 50-51 [1979]).

In *Edmond* (531 US at 42), decided subsequent to *Brown*, the Supreme Court added a new dimension to the three-part test, holding that, where the "primary purpose of [a] narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment." The Court noted that it was "particularly reluctant to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends" (*id.* at 43) and, in distinguishing *Whren v United States* (517 US 806 [1996]), the Court further noted that "programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion" (*id.* at 45-46).

In delivering the opinion of the Court, Justice O'Connor rejected the contention that the checkpoint program in *Edmond* could be sustained based on "its lawful secondary purposes of keeping impaired motorists off the road and verifying licenses and registrations" (*id.* at 46), writing that,

> "[i]f this were the case . . . , law enforcement authorities would be able to establish checkpoints for virtually any purpose so long as they also included a license or sobriety check. For this reason, we examine the available evidence to determine the primary purpose of the checkpoint program. . . . [A] program driven by an impermissible purpose may be proscribed while a program impelled by licit purposes is permitted, even though the challenged conduct may be outwardly similar" (*id.* at 46-47).

Justice O'Connor further "caution[ed] that the purpose inquiry . . . is to be conducted only at the programmatic level and is *not an invitation to probe the minds of individual officers acting at the scene*" (*id.* at 48).

Although there are no New York cases directly on point, we note that the Court of Appeals applied *Edmond* in *People v*

*Jackson* (99 NY2d 125 [2002]). In *Jackson,* New York City police officers set up a roadblock "in response to a recent increase in crime, including carjackings and robberies of taxi and livery cabs," to " 'educate . . . cab drivers' concerning the increase in robberies and shootings, . . . and to interdict '[d]rugs and guns' " (*id.* at 127, 128). The Appellate Division, First Department, determined that the trial court had erred in refusing to suppress the cocaine seized from the defendant at the roadblock, and the Court of Appeals affirmed the order of the First Department. The Court of Appeals in *Jackson* interpreted *Edmond* as having "refine[d]" the test set forth in *Brown v Texas* by requiring the courts to " 'consider the *nature* of the *interests threatened* and their connection to the particular law enforcement practices at issue' " and to " 'look more closely at the nature of the *public interests* that such a regime is designed principally to serve' " (*id.* at 131, quoting *Edmond,* 531 US at 42-43). The Court of Appeals further wrote in *Jackson:*

> "[T]he People have the burden of establishing that the primary *programmatic* objective (not the subjective intent of the participating officers) for initiating a suspicionless vehicle stop procedure was not merely to further general crime control . . . . The [*Edmond*] Court noted that [suspicionless stops] could encompass 'a smaller class of offenses . . . [where] society [is] confronted with [a] type of immediate, vehicle-bound threat to life and limb' . . . . Furthermore, the [*Edmond*] Court . . . held that a qualifying secondary purpose of the police in setting up a roadblock would not serve to validate suspicionless stops primarily motivated by general crime control ends" (*id.* at 131-132).

### III

The facts herein differ from those in *Jackson* because, unlike the officers conducting the roadblock in *Jackson,* the officers conducting the checkpoint here were instructed to and did engage in checking each vehicle they stopped for windshield stickers, driver's licenses and registrations. Indeed, 37 traffic tickets were issued at the subject checkpoint on October 26, 2002. The facts herein also differ from those in *Edmond,* where the avowed primary purpose of the checkpoints was the discovery and seizure of narcotics.

Thus, the issue before us in this case is whether the "primary purpose" of the checkpoint is to be determined by the underly-

ing reason for undertaking it, or by the particular manner in which the checkpoint was conducted (*Edmond,* 531 US at 46). The People contend that the latter approach prevails and that, because the officers operating the checkpoint were checking for windshield stickers, driver's licenses and registrations for the purpose of "vehicle and traffic enforcement," the checkpoint "retained its vehicle and traffic enforcement purpose even as police integrated that purpose into a comprehensive initiative." On the other hand, the court agreed with defendant that, regardless of the "immediate function" of the checkpoint, it was no more than a "key programmatic tool" in the Rochester Initiative's efforts to "control crime by heightened police presence." In resolving the issue, we must, of course, give "great deference" to the determination of the hearing court (*People v Wheeler,* 2 NY3d 370, 374 [2004]; *see People v Prochilo,* 41 NY2d 759, 761 [1977]; *People v Kozikowski,* 23 AD3d 990 [2005]).

The court's determination that the primary purpose of the checkpoint at which defendant was stopped was general crime control is amply supported by the evidence presented at the suppression hearing. As established by the testimony of the officers in charge of carrying out the Rochester Initiative, its avowed purpose was the prevention of violent crime—homicides, assaults, possession of firearms, robberies, and drug trafficking—in the "crescent" area of Rochester. The Rochester Initiative's operations included undercover drug purchases, traffic checkpoints, knocking on doors of homes used for drug sales, buy-busts of street drug sellers, radar details, walking patrols, "meeting citizens," and going to corner stores, all, in the words of the arresting Trooper, in order to "deter crime and make a presence" in the target area. During the two-month period of the Rochester Initiative, 46 checkpoints were conducted, all at night, all in the target area, and all by personnel from the three participating law enforcement agencies.

Were we to examine the checkpoint procedure independently of the underlying function of the task force, we would conclude that there would be no constitutional infirmity. The officers stopped every vehicle, whereupon they checked the windshield stickers, driver's licenses and registrations. According to the testimony at the suppression hearing, if all was in order, the officers sent the drivers "on their way." Standing alone, such a checkpoint would be a permissible routine highway safety-related stop under *Edmond* and *Prouse.* The checkpoint was not, however, conducted in isolation. Rather, the record

establishes that the checkpoint was an inseparable part of the Rochester Initiative, the purpose of which was to detect and deter violent crime and drug trafficking in the target area by the use of the checkpoint and the various other measures set forth above (*see Davis v State*, 788 So 2d 1064, 1066 [Fla 2001]; *see generally Edmond*, 531 US 32 [2000]; *Jackson*, 99 NY2d 125 [2002]). Accordingly, we conclude that the order suppressing the evidence at issue should be affirmed and the indictment should be dismissed.

PIGOTT, JR., P.J., SCUDDER, GORSKI and GREEN, JJ., concur.

It is hereby ordered that the order so appealed from be and the same hereby is unanimously affirmed and the indictment is dismissed.