OPINION OF THE COURT
John L. LaMancuso, J.
Defendant, Nichole L. Dongarra, charged with operating a motor vehicle while having .08 of one per centum or more by weight of alcohol in her blood (Vehicle and Traffic Law § 1192 [2]) and operating a motor vehicle while in an intoxicated condition (Vehicle and Traffic Law § 1192 [3]), has moved to suppress any statements attributed to her, the results of any chemical analysis of her breath, and all other evidence allegedly obtained from her.
Based upon the People’s responding affidavit, which effectively concedes the truth of all allegations necessary to the court’s determination of this motion (see CPL 710.60 [2] [a]; People v Gruden, 42 NY2d 214 [1977]), and after giving both parties an opportunity to be heard on July 17, 2008, the court denies the People’s request for a Dunaway/Scott hearing and decides the instant motion on the papers.
On September 2, 2007 at about 1:00 a.m., defendant’s vehicle was stopped at a New York State Police sobriety checkpoint on Fluvanna Avenue in the City of Jamestown. After allegedly displaying certain outward indicia of intoxication and failing four out of five field sobriety tests, defendant was asked to give a breath sample, which resulted in a reading of a .13% blood alcohol content level. Defendant challenges the constitutionality of the checkpoint stop upon the grounds that the New York State Police failed to follow their own self-established, written guidelines.
In addition to establishing a seemingly stringent protocol for the selection of sites, scheduling, briefing, setup, system of stops and interview procedures, the written guidelines of the New *721 York State Police[1] call for the making of certain records and/or reports before, during and after the date of the checkpoint. When a sobriety checkpoint “is first scheduled,” a “DWI Program Notification” message is supposed to be transmitted to Assistant Deputy Superintendent James L. Schepperly, using a prescribed format. This memorandum is essentially a list of particulars pertaining to the planned checkpoint, including time and location, enforcement personnel and system of stop (every vehicle, every third vehicle, etc.). During the checkpoint, the “DWI Investigative Note Card (TB-38) should be used to record pertinent impairment information” including the officer’s observations, the motorist’s responses to specific questions and the specific cues, or signs of impairment, observed during field sobriety tests. No later than two business days following completion of the checkpoint, a “DWI Program Activity Record” is required to be received at “Division Traffic Services.” This record appears to be a data collection tool, containing useful post-checkpoint information, e.g., the number of vehicles passing through the checkpoint, the number of vehicles stopped and the number of motorists arrested for DWI.
While the guidelines do not specifically mandate the use of the DWI Investigative Note Card, the guidelines speak in more absolute terms about the DWI Program Notification and DWI Program Activity Record. The guidelines provide (in bold language) that “[i]t is imperative that these reports be completed in a timely and accurate manner.” These documents are further described as “legal records that are often referenced in both criminal and civil proceedings.”
The parties’ submissions agree on one essential point, to wit: that none of the above-described documents was ever prepared, let alone transmitted to the appropriate official or division of the New York State Police. Thus, the stage is set for the court to consider the legal consequences of an admitted failure to strictly or substantially observe sobriety checkpoint guidelines.
Whether a law enforcement agency’s failure to follow its own sobriety checkpoint guidelines renders the stop unlawful under the Fourth Amendment of the United States Constitution or *722 article I (§ 12) of the New York Constitution appears to be a question of first impression in New York.[2]
It is well-settled that a roadblock or checkpoint stop is a seizure within the meaning of the Fourth Amendment (People v Scott, 63 NY2d 518 [1984]; Michigan Dept. of State Police v Sitz, 496 US 444 [1990]; Matter of Muhammad F., 94 NY2d 136 [1999]; Indianapolis v Edmond, 531 US 32 [2000]; People v Jackson, 99 NY2d 125 [2002]; People v Trotter, 28 AD3d 165 [4th Dept 2006], lv denied 6 NY3d 839 [2006]). As a general rule, a seizure of an automobile, whether on a highway or at a roadblock, requires an individualized suspicion of wrongdoing (Indianapolis v Edmond, 531 US 32 [2000], supra). The United States Supreme Court has “recognized only limited circumstances in which the usual rule does not apply” (id. at 37). In general, a sobriety checkpoint aimed at removing drunk drivers from the road does not violate the Fourth Amendment (Michigan Dept. of State Police v Sitz, 496 US 444 [1990], supra).
On the other hand, a vehicle checkpoint whose primary programmatic purpose is indistinguishable from the general interest in crime control has been declared unconstitutional (Indianapolis v Edmond, 531 US 32 [2000], supra). In Indianapolis, the Court held that a city’s drug interdiction checkpoint violated the Fourth Amendment, reasoning that the connection to the roadway of the city’s anticontraband agenda was “very different from the close connection to roadway safety that was present in Sitz” (id. at 43). “Under the holding in City of Indianapolis, the People have the burden of establishing that the primary programmatic objective (not the subjective intent of the participating officers) for initiating a suspicionless vehicle stop procedure was not merely to further general crime control” (People v Jackson, 99 NY2d 125, 131-132 [2002] [citation omitted]). As one court stated, “the People’s proof must also establish an articulable public safety concern that in the first instance justified utilization of a checkpoint at the particular chosen location” (People v Cabrera, 13 Misc 3d 1205[A], 2006 NY Slip Op 51689[U], *2 [Crim Ct, Queens County 2006, Raciti, J.]).
The People’s burden of proof as to the programmatic purpose is derived from the constitutional principle underlying “the *723 reasonableness of a suspicionless roadblock stop, i.e., ‘a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty’ ” (Trotter, 28 AD3d at 168, quoting Brown v Texas, 443 US 47, 50-51 [1979]). Absent such proof, a court is left “without any basis to assess ‘the gravity of the public concerns served by the seizure’ or ‘the degree to which the seizure advance[d] the public interest’ ” (Cabrera, 13 Misc 3d 1205[A], 2006 NY Slip Op 51689[U], *3).
The primary programmatic purpose must be determined by examining “the underlying reason for undertaking it” as opposed to “the particular manner in which the checkpoint was conducted” (Trotter, 28 AD3d at 169-170). Thus, where the Rochester Police Department checked vehicles at a checkpoint for windshield stickers, driver’s licenses and registrations as part of a larger initiative aimed at detecting and deterring violent crime and drug trafficking in a specific target area, the stop violated the defendant’s Fourth Amendment rights and all items seized from the defendant were properly suppressed (People v Trotter, 28 AD3d 165 [2006], supra).
In order to remove the “legal stigma of ostensibly violating the Fourth Amendment proscription against warrantless and suspicionless stops” (People v Cabrera, 13 Misc 3d 1205[A], 2006 NY Slip Op 51689[U], *2), the government bears the burden of satisfying the following, additional requirements. First, a checkpoint must be “carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers” (Scott, 63 NY2d at 525 [internal quotation marks and citations omitted]).[3] “[Scott held] that there had to be a plan for officers to follow and by which personnel’s actions could be objectively measured” (People v Richmond, 174 Misc 2d 40, 43 [Monroe County Ct 1997]). Second, the United States Supreme Court has “insisted that the discretion of the official *724 in the field be circumscribed” (Delaware v Prouse, 440 US 648, 661 [1979]). Thus, primarily because of the “legal stigma” attached to
“warrantless and suspicionless stops . . . the People bear the burden of proving at a suppression hearing that the particular checkpoint in question was conducted in a non-discretionary manner; that is . . . the officers did not exercise individual discretion as to which cars to stop or what questions to ask” (People v Cabrera, 13 Misc 3d 1205[A], 2006 NY Slip Op 51689[U], *2, citing Matter of Muhammad F., 94 NY2d 136 [1999], supra).
Third, there should be “adequate precautions as to safety, lighting and fair warning of the existence of the checkpoint” (see Scott, 63 NY2d at 526). Fourth, the location of a fixed checkpoint should be “chosen [not] by officers in the field, but by officials responsible for making overall decisions as to the effective allocation of limited enforcement resources” (see Matter of Muhammad F., 94 NY2d 136, 144 [1999] [internal quotation marks omitted], quoting United States v Martinez-Fuerte, 428 US 543, 559 [1976]). The plan, directive or guidelines, as it were, should emanate from the higher echelons of the police department, sheriff or State Police (see People v Scott, 63 NY2d 518 [1984], supra; accord People v Richmond, 174 Misc 2d 40 [1997], supra [record failed to reveal any proof of any plan promulgated by the chief of police]).
Collectively, the foregoing requirements constitute a substitute for the constitutional norm of individualized suspicion. While the list may seem formidable, law enforcement agencies have a choice of routes. One is the familiar road of individualized suspicion; the other is the less traveled and more exotic road built by Court of Appeals and U.S. Supreme Court precedents. Both roads exact constitutional tolls on their travelers.
Inasmuch as the plan should emanate from the higher echelons of the law enforcement agency and inasmuch as the discretion of the individual officers in the field must be circumscribed, logic dictates that the plan must be followed. A plan whose execution is left to the whim and caprice of officers in the field is no plan at all. To conclude that officers in the field must follow a plan which is set in place by the higher echelons, and then to conclude that the officers in the field may cavalierly disregard certain key elements of that plan, whether intentionally or unintentionally, would be to countenance the *725 “standardless and unconstrained discretion” and “evil” the Supreme Court spoke about it in Delaware v Prouse (440 US 648, 661 [1979]). On the other hand, courts need to temper this “execution” expectation with a certain measure of restraint. Not all plan deviations merit application of the draconian “fruit of the poisonous tree” doctrine (Wong Sun v United States, 371 US 471, 487-488 [1963]). “Appellate courts have, indeed, differed on whether police must comply with written guidelines strictly or substantially” (People v Velit, 2002 NY Slip Op 50066[U], *4).
In Commonwealth v Anderson (406 Mass 343, 547 NE2d 1134 [1989]), the Supreme Court of Massachusetts held that the Commonwealth must carefully comply with written, checkpoint guidelines and that “substantial compliance” is not the standard for a roadblock seizure. Thus, where the state police guidelines imposed a two-hour limit on the duration of any roadblock unless the troop commander ordered otherwise, and where the supervisor on the scene without the troop commander’s authorization extended the duration of the roadblock by 30 minutes, the evidence was held to be lawfully suppressed (id.). The court reasoned that “written guidelines . . . have been accepted as a sufficient substitute for the usual Fourth Amendment ‘reasonableness’ demands” (406 Mass at 348, 547 NE2d at 1137) and that “[t]o allow the Commonwealth to do anything short of complying in full with its own guidelines would inject an element of discretion into the roadblock procedures and thus undercut the very foundation upon which the roadblock seizure is constitutionally justified” (406 Mass at 350, 547 NE2d at 1137-1138).
In Commonwealth v Yastrop (564 Pa 338, 768 A2d 318 [2001]), the Supreme Court of Pennsylvania ruled that “substantial compliance with [guidelines established in two earlier precedents of Pennsylvania’s highest court] is all that is necessary to minimize the intrusiveness of a roadblock seizure to a constitutionally acceptable level” (564 Pa at 348, 768 A2d at 323).
This court believes the fairest course is to require law enforcement agencies to adhere to a standard of substantial compliance with their own guidelines. Not every trivial deviation from written guidelines will turn a sobriety checkpoint into an unreasonable seizure.
Applying the “substantial compliance” benchmark to the facts of the case at bar, the court is led to the ineluctable conclusion that the checkpoint at issue was unconstitutional and *726 represented an unlawful search and seizure. In the first instance, the DWI Program Notification is more than a mere ministerial act. The DWI Program Notification is the first step in obtaining the requisite “higher echelon” approval of the chosen sites. By requiring the DWI Program Notification to be sent to the Assistant Deputy Superintendent, the State Police have in effect designated the Assistant Deputy Superintendent as the appropriate supervisory level officer with the responsibility “for making overall decisions as to the effective allocation of limited enforcement resources” (Matter of Muhammad F., 94 NY2d 136, 144 [1999]). In the second instance, the DWI Program Activity Record is more than a redundant collection of post-checkpoint statistics. Not completing this record deprives courts and the State Police alike of the kind of “ ‘empirical data' demonstrating the effectiveness of the means chosen by law enforcement officials” (id. at 145, citing Michigan Dept. of State Police v Sitz, 496 US 444, 453-455 [1990]).
Based upon the foregoing, the court grants defendant’s motion to suppress the results of any chemical analysis of defendant’s breath, any and all statements attributed to her and all other evidence allegedly obtained from her.

. See New York State Police DWI Program Guide: Guidelines for the Operation of Sobriety Checkpoints and DWI Saturation Patrols (rev Sept. 20, 2002).

. In People v Sears (2 Misc 3d 447 [Webster Just Ct 2003, DiSalvo, J.]), the defense contended that the police did not properly follow their own guidelines with regard to site selection. However, based on the evidence presented at the Scott hearing, the court rejected that argument and found that the site was not improperly selected. No opinion was expressed as to the consequences of such a failure.

. Although there is no absolute requirement that such plan or guidelines be in writing (People v Sinzheimer, 15 AD3d 732 [3d Dept 2005], lv denied 5 NY3d 794 [2005]; and see People v Serrano, 233 AD2d 170 [1st Dept 1996], lv denied 89 NY2d 929 [1996]; but see People v Velit, 2002 NY Slip Op 50066[U] [Crim Ct, Queens County 2002] [failure to produce written guidelines found to be devastating to the People’s case, and interpreting Matter of Muhammad F. as expressly requiring written guidelines]), it has been suggested that “written plans for roadblocks may be the better procedure to use in order to meet the requirements of Scott” as they “leave less to memory and interpretation” (People v Richmond, 174 Misc 2d 40, 44 [Monroe County Ct 1997]).